# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC., DANIEL DAY, DAVID HORN, KENNETH REINSCH, AND JASON BUCKALLEW, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) ) ) ) | Civil Action No. 00-0258-CV-W-2-FJG-ECF |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| LEDAR TRANSPORT, INC., HAWTHORN LEASING, INC. a/k/a HAWTHORNE LEASING, INC., CARL E. HIGGS, ALICE NORMA HIGGS, and SCOTT L. HIGGS, | ) ) ) ) ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS
OF LAW RELATING TO DAMAGES OF PLAINTIFFS AND
INDIVIDUAL CLASS MEMBERS**

**A.     General Facts**

1.      The Court certified this case as a class action.  (Doc. # 181).  The class is defined as those owner-operators who entered into a lease agreement with Defendant Ledar Transport, Inc. from June 1996 through January 2001.

2.      The Court named Plaintiffs Daniel Day, David Horn, Kenneth Reinsch, and Jason Buckallew, and the Owner-Operator Independent Drivers Association, Inc. as representative Plaintiffs.

3.      On December 30, 2004, the Court entered Findings of Fact, Conclusions of Law

1

and Judgment on liability. (Doc. # 352). The Court found that Ledar violated the Truth-in-Leasing regulations and that the facts justified piercing the corporate veil to find that the individual Defendants, Carl E. Higgs, Scott L. Higgs and Alice Norma Higgs were personally liable for such violations.

4. The Court found that Ledar violated the escrow provisions of the leasing regulations (49 C.F.R. § 376.12(k)); the compensation provision of the regulations (§ 376.12(d)) and the charge-back provision of the regulation (§ 376.12(h)).

5. There are 606 members of the class certified by the Court ("Class members").

6. In its Order dated January 19, 2006, the Court noted that the parties reported that they were preparing stipulations relating to damages.[1]

7. The parties entered into a stipulation, referred to herein as the "Stipulation." It states that Plaintiffs and Defendants

> Hereby stipulate that the attached spreadsheet, (attached as Exhibit A), contains the following information: (1) the name of each Class member, (2) the type of equipment lease agreement entered into by the Class member, (3) the total amount deducted from each Class member for security deposits; and (4) the total amount deducted from each Class member for maintenance reserves. The parties hereby stipulate that the information contained in Exhibit A is derived from Ledar's records and may be relied upon by all parties.[2]

8. The Stipulation sets forth information regarding each class member who

---

[1] (Doc. #401).

[2] Stipulation, Ex. A to Pls. Motion for Summary Judgment on Damages, ECF (Doc. # 412).

2

entered into a lease agreement with Defendant Ledar Transport between June 1996 and January 2001.

9.      Tab or Exhibit A to the Stipulation states the "Security Deposit Total Deduction" for each Class member.

10.     Tab or Exhibit A to the Stipulation states the "Maintenance Reserve Total Deduction" for each Class member.

**B.      Conclusions of Law Relating to General Facts**

11.     Tab or Exhibit A to the Stipulation states the "Maintenance Reserve Total Deduction" for each Class member.

12.     Defendants argue that the Stipulation does not reflect the total amount of escrow funds escrowed by the Defendants.  Defendants submit the affidavit of their counsel, Russell Powell, in an attempt to rebut the plain language of the Stipulation. According to Mr. Powell, the Stipulations regarding the amounts Ledar deducted for both maintenance and security deposit escrow funds were purely hypothetical.  Counsel for Defendants suggests that Defendants never intended to stipulate to the actual amounts deducted for escrow funds because Plaintiffs and Class members owed money to Ledar.

13.     The Court concludes that the language of the Stipulation is clear on its face and is not open to interpretation.  It stated the attached spreadsheets contains "the total amount deducted from each Class Member for security deposits" and "the total amount deducted from each Class Member for maintenance reserves."

14.     The Court concludes that there is no basis for Defendants, after entering into these factual stipulations, to now assert that they reflect phantom, and not actual,

3

deductions.  <u>Sims v. Wyrick</u>, 743 F.2d 607, 610 (8th Cir. 1984)("stipulations of fact fairly entered into are controlling and conclusive, and that relief from such stipulations will be granted only under exceptional circumstances."); <u>See also</u>  <u>Am. Red Cross v. Community Blood Center of the Ozarks</u>, 257 F.3d 859, 864 (8th Cir. 2001); <u>Kealy v. Harter</u>, 682 F.2d 198, 201 (8th Cir. 1982); <u>Fenix v. Finch</u>, 436 F.2d 831, 837 (8th Cir. 1971).

15.     The Court concludes that there are no "exceptional circumstances" here to justify Defendants' attempt to relieve themselves from the Stipulation.  Thus, the Court disregards the affidavit of Russell Powell and concludes instead that the Stipulation entered into by the parties is controlling and conclusive as to the amounts deducted from each Class member for both maintenance and security deposit escrow funds.

**C.     Facts Relating to Security Deposit Damages**

16.     Paragraph 4.m. of Ledar's Standard Lease Agreement with Plaintiffs and Class members provided that "Lessor shall furnish to Lessee a security deposit in the amount of $ 1000.00 in order to secure the payment of any amounts advanced to Lessor by Lessee."

17.     Paragraph 4.m. of the Standard Lease provided that "[u]pon final settlement Lessee [Ledar] may deduct [from the security deposit] *all* monies due it by Lessor [owner-operator] such as, *but not limited to*, advances for fuel, security deposits, repairs, cash, loans and claims" (emphasis added).

18.     The Standard Lease failed to specify the items that may be deducted from escrow, fails to state that the owner-operator may demand an accounting at any time, fails to state that a final accounting will be rendered, and fails to state that interest will

4

be paid.

19.     Ledar deducted, from Plaintiffs' compensation, $ 1,000.00 for a security deposit, usually in installments of $ 250 per week.[3]

20.     A total of 247 Class Members had security deposit escrow funds deducted from their compensation pursuant to the lease agreement entered into between the Class member and Ledar Transport.  (Stipulation).

21.     The identity of each Class Member who had security deposits retained in escrow by Ledar is contained in Exhibit A to the Stipulation.

22.     The Stipulation between the parties states the amount of each Class member's security deposit escrow fund at the time of each Class Members' lease termination.

23.     The Court credits the Stipulation between the parties and finds that Ledar retained security deposit escrow funds in the amounts stated in the Stipulation for each individual Class member.

24.     The Court also finds that Ledar failed to pay interest on any security deposit escrow funds.  This finding is consistent with the prior findings of the Court that the Standard Lease did not provide for the payment of interest for Security Deposits and by the testimony of Carl Higgs in which he testified that he did not consider the Security Deposit to be an escrow fund.

25.     Plaintiffs' expert, Joseph Roos, calculated the amount of interest owing to each Class Member.  Roos calculated the amount of interest based upon the rate of the

---

[3]  Pls. Trial ("Tr.") Exs. 3-8; 12-16, 20-26; 30-36.

91-day Treasury bill for each quarter beginning in 1996 and continuing through December 31, 2006.[4]

26. The Court credits the methodology and amounts calculated by Roos as stated in his Report dated April 13, 2007.

27. The Court finds, based upon the Stipulation between the parties, that Ledar retained an aggregate of $246,250.00 in Class Members' security deposits.

28. The Court finds, based upon the Declaration and Report of Plaintiffs' expert, Joseph Roos, that Ledar, as of December 31, 2006, failed to pay an aggregate of $73,952.45 in interest on Class Members' security deposits.

**D. Conclusions of Law Relating to Security Deposit Damages**

29. Having established liability, the issue before the Court is the proper measure of damages for Truth-in-Leasing violations regarding escrow funds.

30. Defendants argue that Plaintiffs have failed to prove damages. Defendants cite to the Eighth Circuit's case in Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc., 339 F.3d 1001, 1012 (8th Cir. 2003), cert. denied, 541 U.S. 973 (2004) where the court noted, in dicta, that defendant would not be liable for returning escrow funds if putative class members did not have a positive balance in the escrow accounts.

31. The Court concludes that in this case, as opposed to New Prime, the parties have stipulated as to how much money was deducted from each Class member for security deposit and maintenance reserve escrows.

---

[4] *See* Roos Declaration; Plaintiffs' Motion for Summary Judgment on Damages (Doc. #142, Exhibit B), Tab 4, Third Supplemental Report dated April 13, 2007.

6

32.    Plaintiffs have proven, for each Class member the unrecovered net balance in the security deposit and maintenance reserve escrow accounts.

33.    Defendants also argue that Plaintiffs have not proven damages because 49 U.S.C. § 14704(a)(2) states that damages must be "as a result of action or omission" of a motor carrier.  The Court concludes that Plaintiffs proved causation in the liability trial, wherein the Court held that Ledar violated the Truth-in-Leasing regulations by failing to return escrow funds.  Thus, the Court concludes that Plaintiffs have proven both causation and the amount of damages to be awarded for each Class member.

34.    "Compensatory damages . . . focus on the plaintiff's losses and seek to recover in money the value of the harm done to him."  Kerr v. Chargles F. Vatterott & Co., 184 F.3d 938, 944 (8th Cir. 1999).

35.    "The proper measure of damages is what is necessary to make the plaintiffs whole."  Owner-Operator Indep. Drivers Ass'n, Inc v. Arctic Express, Inc., 288 F.Supp.2d 895, 907 (S.D. Ohio 2003).  "Had the Defendants here complied with the provisions of 49 C.F.R. § 376.12(k), then the Plaintiff owner-operators, within 45 days of the termination of their respective leases, would have recovered the net balance of their maintenance escrow funds."  Id.

36.    The measure of damages is thus the unrecovered amounts remaining in the maintenance escrows at the time of termination of each class member."  Id.  "The unrecovered net balance in the escrow account is the amount of damage suffered by the Plaintiffs as a result of the Defendant's wrongdoing."  Id. at 908.

37.    In this case, the Court concludes that Plaintiffs and individual Class members are entitled to the return of the balance in their security deposit escrow funds

7

at the time of lease termination.

38.     The Court hereby awards damages to Plaintiffs and Class members in the amount equal to their unreimbursed security deposits ($246,250.00) plus interest, through December 31, 2006, per the rate stated in section 376.12(k) ($73,952.45).

**E.      Facts Relating to Maintenance Reserve Damages**

39.     Plaintiffs Buckallew, Day and Horn entered into Lease-Purchase agreements with Defendants Hawthorn Leasing, Ledar and Scott Higgs respectively.[5]

40.     Buckallew's Lease-Purchase agreement with Hawthorn established a "major maintenance reserve" under which Ledar would deduct seven cents per mile from Buckallew's compensation.  According the agreement, "[t]he entire balance of the account will become the property of Lessor [Hawthorne] at the time the lease is terminated or if terminated prior to its completion date.  After the completion date of the lease the account will be distributed 50% to Lessee [Buckallew] and 50% to Lessor [Hawthorne]."  The agreement also states that "[i]f Lessee breaches said Agreement, Lessor has the right to hold any wages due and owing said Lessor as of the date of breach of this agreement until such time that it can be determined if Lessee owes Lessor any other monies under any provision of this contract."

41.     Plaintiff Day entered into a lease-purchase agreement with Ledar for a tractor truck, which contained the same "major maintenance reserve" provisions that were contained in Plaintiff Buckallew's agreement with Hawthorn.

42.     Plaintiff Horn entered into a lease-purchase agreement with Scott Higgs,

---

[5]  Pls. Tr. Exs. 1 (Day); 10 (Buckallew); 18 (Horn).

under which Scott Higgs agreed to lease Horn a tractor truck. The lease-purchase agreement had the same "major maintenance reserve" provisions that were contained in Plaintiff Buckallew's agreement with Hawthorne, except that the amount deducted was five cents per mile instead of seven cents. Paragraph 15 of the lease-purchase agreement stated that the "equipment will be operated exclusively under a lease agreement with Ledar Transport, Inc."

43.     Scott Higgs entered into similar agreements with 67 Class members.[6]

44.     Ledar deducted from Buckallew's and Day's compensation seven cents per mile for the "major maintenance reserve." Ledar deducted five cents per mile from Horn's compensation. These deductions are stated on Plaintiffs' settlement statements.[7]

45.     Plaintiffs never received any accountings for maintenance reserves from Hawthorn, Ledar or Scott Higgs.[8]

46.     There were no documents admitted at trial indicating that any accountings of maintenance reserves were provided to Plaintiffs or Class members.

47.     None of the Plaintiffs ever received a final accounting of their maintenance fund reserve from Ledar, Hawthorn or Scott Higgs.[9]

48.     Scott Higgs admitted that he did not provide final accountings for

_____

[6] Tr. 518/2 - 520/19 (Scott Higgs); Pls. Tr. Ex. 363.

[7] Pls. Tr. Exs. 3-8; 12-16; 20-26.

[8] Tr. 160/25 - 161/6 (Buckallew). Tr. 220/11 - 221/3 (Horn).

[9] Tr. 52/1 - 52/18 (Day); Tr. 132/5 - 132/16 (Adams); Tr. 177/7 - 177/10 (Buckallew); Tr. 220/11 - 221/3 (Horn); Tr. 359/24 - 360/2 (Eiland).

maintenance reserve funds created under contracts between Higgs and Class members.[10]

49.     The last settlement statements given to Plaintiffs, as well as to Class members, do not provide "a final accounting to the lessor of all such final deductions made to the escrow fund" as required by § 376.12(k)(6).  In fact, the final settlement statements are completely silent on the disposition of maintenance fund escrows

50.     A total of 443 Class Members had maintenance reserve escrow funds deducted from  their compensation pursuant to Equipment Lease Agreements ("Lease Purchase Agreements") with either Ledar, Hawthorn Leasing, or Scott Higgs. (Stipulation, Ex. A).

51.     The identity of each Class member who had maintenance reserve escrow funds retained by Defendants is contained in Exhibit A to the Stipulation between the parties.

52.     The Stipulation states the amount of each Class member's maintenance reserve escrow fund at the time of each Class members' lease termination.

53.     The Court credits the Stipulation between the parties and finds that Defendants retained maintenance reserve escrow funds in the amounts stated in the Stipulation for each individual Class member.

54.     There is no evidence that Ledar, Hawthorn or Scott Higgs paid interest on owner-operator maintenance reserves.[11]  The Court finds that Defendants failed to pay

---

[10]  Tr. 523/12 - 523/18 (Scott Higgs).

[11]  Tr. 161/7 - 161/9 (Buckallew); Tr. 523/2 - 523/11 (Scott Higgs).

10

interest on any maintenance reserve escrow funds.

55.     Plaintiffs' expert, Joseph Roos, calculated the amount of interest owing to each Class member.  Roos calculated the amount of interest based upon the rate of the 91-day Treasury bill for each quarter beginning in 1996 and continuing through December 31, 2006.[12]

56.     The Court credits the methodology and amounts calculated by Roos as stated in his Declaration and Report dated April 13, 2007.

57.     The Court finds, based upon the Stipulation between the parties, that Defendants retained an aggregate of $529,547.02 in Class members' maintenance reserve escrow funds.

58.     The Court finds, based upon the Declaration and Report of Plaintiffs' expert, Joseph Roos, that Defendants, as of December 31, 2006, failed to pay an aggregate of $129,429.42 in interest on Class members' maintenance reserve escrow funds.

**F.     Conclusions of Law Relating to Maintenance Reserve Damages**

59.     "The proper measure of damages is what is necessary to make the plaintiffs whole."  OOIDA v. Arctic Express, Inc., 288 F.Supp.2d 895, 907 (S.D. Ohio 2003).  "Had the Defendants here complied with the provisions of 49 C.F.R. § 376.12(k), then the Plaintiff owner-operators, within 45 days of the termination of their respective leases, would have recovered the net balance of their maintenance escrow funds."  Id.

60.     The measure of damages is thus the unrecovered amounts remaining in

---

[12]  See Roos Declaration; Plaintiffs; Motion for Summary Judgment on Damages (Doc. 412, Exhibit B), Tab 4, Third Supplemental Report dated April 13, 2007.

Case 4:00-cv-00258-FJG   Document 433   Filed 03/31/08   Page 11 of 30

the maintenance escrows at the time of termination of each class member." Id. "The unrecovered net balance in the escrow account is the amount of damage suffered by the Plaintiffs as a result of the Defendant's wrongdoing." Id. at 908.

61.     In this case, the Court concludes that Plaintiffs and individual Class members are entitled to the return of the balance in their maintenance reserve escrow funds at the time of lease termination.

62.     The Court hereby awards damages to Plaintiffs and Class members in the amount equal to their unreimbursed maintenance reserves, ($529,457.02), plus interest, through December 31, 2006, per the rate stated in section 376.12(k) ($129,429.42).

**G.     Facts Relating to Defendants' Defenses**

1. Facts Relating to Set-Offs Against Maintenance and Security Deposits Escrows

63.     The Equipment Lease Agreements between Class Members and Ledar, Hawthorn Leasing and Scott Higgs each contained the following clause:

> 3a.  A major maintenance reserve will be established by the carrier to which the equipment is leased deducting from each weekly settlement [$0.05 or $0.07] per dispatched mile and distributing this amount to Lessor.  Lessor will accumulate these amounts in the aforementioned account to be paid for major drivetrain (engine, transmission, clutch, or rear drive axles) repairs that amount to $2500.00 or more.  Tires for any complete axle will be purchased from this account.  No expenditures will be paid from this account that exceed the balance of the account and in the event maintenance or tire requirements exceed the account balance, they will be considered operating expenses and must be paid by Lessee. The entire balance of the account will become the sole property of Lessor any time the lease is terminated prior to its completion date.  After the completion date of the lease the account will be distributed 50% to Lessee and 50% to Lessor.

12

Trial Exhibits 1, 10, 18; Stipulation, Ex. A.

64.     The parties stipulated, in their Stipulation, Tab or Exhibit B, by Class member, to the amount of maintenance costs, and the specific items, upon which Defendants seek recoupment of maintenance costs.

65.     Ledar's invoices purporting to show maintenance expenses reveal virtually no instances where Ledar's alleged repairs were for drivetrain components (engine, transmission, clutch, or rear drive axles) that exceeded $ 2,500.  (Stipulations regarding "Unrecouped Maintenance," Tab B.)

66.     As a result, the Court finds that Defendants have failed to submit evidence demonstrating that the repairs for which they seek reimbursement for were repairs that would have been covered under the terms of the Equipment Lease Agreement.

67.     Defendants claim that Plaintiffs and virtually every Class member owes Ledar and/or Hawthorne money for a variety of alleged debts, including debt for repairs, fuel, advances, insurance premiums, truck recovery and other operating expenses. (See Defs. Opp. Pls. Motion for Summary Judgment on Damages, Exs. D, F; Doc. # 421).

68.     Defendants failed to provide Plaintiffs with written notice that repairs were made to Plaintiffs' trucks after Plaintiffs terminated their lease agreement with Ledar.[13]

69.     Ledar's failure to provide timely documentation of repair costs deprived Buckallew and Horn of information necessary to discern or dispute such charges.[14]

_____

[13] Tr. 175/24 - 176/2 (Buckallew); 214/4 - 217/20 (Horn).

[14]  Tr. 175/24 - 176/2 (Buckallew); 214/4 - 217/20 (Horn).

13

70.     The Court finds that, after the elapse of almost ten years, Class members would also find it difficult to challenge the veracity and legitimacy of such charges.

71.     Paragraph 4.m. of Ledar's Standard Lease Agreement contains an "early lease termination fee," which states that if the lease is terminated by Lessor for any reason within one year of the execution date hereof, then the security deposit shall be considered an "early lease termination fee" and shall be retained by Lessee.

72.     The "early lease termination fee" was a penalty imposed by Ledar, unrelated to actual costs involved with the operation of the leased equipment.

73.     During the Class period, Ledar treated security deposits immediately as income, whereas under generally accepted accounting principles, they should have been considered liabilities.[15]

74.     After lease termination, the security deposit was omitted from any final reconciliation and not credited or returned to drivers.[16]

75.     Plaintiffs' Day, Horn and Reinsch never received any final accounting describing all final deductions made to their security deposit escrows.[17]

76.     A review of the last settlement sheets for each of the named Plaintiffs and other drivers reveals that there was no accounting for the disposition of the security deposit escrows.[18]

---

[15] Tr. 565/1 - 565/19 (Roos).

[16] Tr. 565/20 - 566/1 (Roos).

[17] Tr. 31/6 - 32/1 (Day); 219/20 - 220/10 (Horn); 265/10 - 265/13 (Reinsch).

[18] Pls. Tr. Exs. 8, 16, 27, 47.

14

77.     None of the Plaintiffs received their security deposit or any portion thereof within 45 days of lease termination.

78.     Carl Higgs testified that he did not believe that the security deposit was subject to the escrow provisions of the leasing regulations.[19]

2.      Facts Relating to Defendants' "Windfall" Argument

79.     Of the approximately 600 members of the Class, approximately 260 (43%), did not last 30 days with Ledar.[20]

80.     Another 160 (26%) terminated their leases between 30 and 60 days.  Carl Higgs, President of Ledar, admitted that of the approximately 750 drivers that were leased to Ledar from 1992 through 2004, less than one-percent of drivers completed their lease agreements.[21]

81.     All of the trucks used by Ledar in its freight-hauling business were titled in the names of Carl Higgs and Scott Higgs, and at least one in the name of Norma Higgs.[22]  The Higgs' trucks were either leased by them to one of their corporations (either Ledar or Hawthorne) and then leased by those corporations (per lease-purchase agreements) to owner-operator drivers, or the Higgs leased them (per lease-purchase agreements) directly to owner-operator drivers, who in turn leased them to Ledar for use in its freight-hauling business.

---

[19]  Deposition Designation of Carl Higgs, Pls. Tr. Ex. 384.

[20]  Tr. 572/7 - 572/21 (Roos); Pls. Tr. Ex. 113.

[21]  Carl Higgs Dep. Designation, Pls. Tr. Ex. 384:  43/1 - 43/20.

[22]  Tr. 408/15 - 409/21; Tr. 413/25 - 414/3; Tr. Ex. 381:  26/12 - 24; Pls. Tr. Exs. 202 - 272.

15

82.     Though Hawthorne Leasing was set up nominally as a corporation and supposedly leased trucks from Carl Higgs and Scott Higgs to be re-let to drivers, no money was ever paid by Hawthorne Leasing to Carl or Scott Higgs.  Rather, Ledar paid the purchase money lenders directly, bypassing the drivers, Hawthorne, and the Higgs in the process.[23]

83.     Carl Higgs characterized what were, on their face, leases of equipment from Hawthorne to Ledar as mere "position papers" never put into effect.[24]

84.     These practices resulted in the Higgs building up personal equity using corporation funds, but outside the control or accounting of the corporations.[25]

85.     The high owner-operator turnover rate at Ledar was motivated, at least in part, by a desire on the part of Defendants to prevent Plaintiffs and Class members from completing their equipment leases, and obtaining title to the trucks.[26]

86.     The high owner-operator turnover rate at Ledar personally benefited the Higgs because it allowed continued collection, and forfeiture, of down payments, maintenance funds and security deposits.[27]

87.     The forfeiture of maintenance reserves allowed Ledar to use these funds to satisfy other obligations, including payments to truck lien holders to satisfy the

---

[23]  Pls. Tr. Ex. 381:  22/16 - 23/25; Pls. Tr. Ex. 381:  55/16 -5 6/5; Tr. Ex. 381:  56/12 - 57/1; Tr. 538/10 - 540/16; Tr. 696/15 - 697 - 10 (Carl Higgs).

[24]  Pls. Tr. Ex. 384:  119/23 - 120/22.

[25]  Tr. 566/25 - 567/17 (Roos); Pls. Tr. Exs. 111, 112.

[26]  Tr. 572/6 - 573/14 (Roos); Tr. 236/14 - 242/5 (Doss).

[27]  Tr. 572/6 - 573/14 (Roos).

16

personal obligations of Carl and Scott Higgs.[28]

88.     Ledar, in its internal bookkeeping, initially accounted for maintenance reserves as liabilities of Ledar.[29]  Ledar then changed its practice, and instead forfeited maintenance reserves on a monthly basis.[30]

89.     Ledar also used inconsistent methods, in its internal calculations, to account for forfeitures.  Sometimes maintenance forfeitures were charged against a revenue account, or to reduce an expense, or to reduce an account receivable.[31]

90.     The Court finds that such inconsistency evidences an attempt to conceal the amount of forfeitures and to obscure where the maintenance funds were going.[32]

91.     The Court finds, based upon the foregoing facts, that Plaintiffs and Class members would not incur a "windfall" should the Court require Defendants to return their security deposit and maintenance reserve escrow funds.  Specifically, the Court finds that Defendants' business model was premised upon an extremely high turnover rate, which pursuant to the forfeiture clause of both the security deposit and maintenance reserve provisions of the Standard Lease Agreement, purported to allow Defendants to retain security deposits and maintenance reserve escrow funds when Class members terminated their lease with Ledar prior to the completion of one year.  Carl and Scott

_____

[28]  Tr. 589/18 - 589/23 (Roos).

[29]  Tr. 605/13 - 606/3 (Roos).

[30]  Tr. 605/13 - 606/3 (Roos) Pls. Tr. Ex. 111.

[31]  Tr. 563/11 - 565/19 (Roos) Pls. Tr. Ex. 111.

[32]  Tr. 563/11 - 565/19 (Roos) Pls. Tr. Ex. 111.

17

Higgs, and not Ledar or Hawthorne Leasing, were the titleholders to the trucks Ledar and Hawthorn leased to Class members, and the Higgs's personally benefitted by the high turnover rates as the constant turnover ensured that the Higgs's would keep for themselves title and equity in the trucks.

**H.    Conclusions of Law Regarding Defendants' Defenses**

92.    Defendants claim that they are entitled to set-off and/or recoupment against Plaintiffs and Class member's security deposit escrow funds for amounts advanced by Ledar for fuel, repairs and loans and that, should the Court award damages to Plaintiffs and Class members for security deposit damages, such damages would constitute a "windfall."

1.    Conclusions of Law Regarding Defendants' Set-Off Claims

93.    This Court has previously analyzed Defendants' claims against Plaintiffs and Class members, in the first instance dismissing Defendants' counterclaims against Plaintiffs and Class members.  Order, January 7, 2004, (Doc. # 292), at pp.18-22.  The Court found that "while there may be some issues that overlap, defendants' counterclaims against the plaintiffs relate to whether plaintiffs owe defendants money under state law, while plaintiffs' claims relate to whether defendants violated the federal truth-in-leasing regulations."  Order, January 7, 2004, (Doc. # 292), at pp.18-19.  The Court also found that "there is no logical relationship between the plaintiffs' claims and defendants' counterclaims."  Id.  Thus, the Court held that the Defendants' counterclaims were permissive and dismissed them for lack of jurisdiction.  Id.

94.    The Court reaffirmed its ruling in granting Plaintiffs' motion *in limine* to preclude Defendants' expert from testifying as to Defendants' "offsets" against Plaintiffs

and Class members. Order, Dec. 21, 2005, (Doc. # 395). The Court found that Defendants' alleged "offsets" were indistinguishable from their counterclaims, and precluded Defendant's expert from offering "any testimony regarding offsets which the plaintiffs allegedly owed to the defendants." Id.

95. In response to Plaintiffs' Motion for Summary Judgment on Damages, Defendants again raised the issue of set-offs, arguing that the Court has supplemental jurisdiction over Defendants' set-off claims because they are only defensive claims. The Court held that jurisdiction of Defendants' set-offs is possible, but not automatic. (Doc.# 425), October 4, 2007, citing Lefkovitz v. Wagner, 395 F.3d 773, 782 (7th Cir.), cert. denied, 546 U.S. 812 (2005). The Court declined to exercise supplemental jurisdiction over Defendants' set-offs for the reasons stated in its prior orders.

96. 28 U.S.C. § 1367 "combines the doctrines of pendent and ancillary jurisdiction under a common heading" of supplemental jurisdiction. Myers v. Richland County, 429 F.3d 740, 746 (8th Cir. 2005), citing City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 165 (1997).

97. Section 1376(a) provides in part that "in any civil action of which the districts courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article II of the United States Constitution."

98. "Claims within the action are part of the same case or controversy if they 'derive from a common nucleus of operative fact.'" Myers, 429 F.3d at 746. This is the familiar test from United Mine Workers v. Gibbs, 384 U.S. 715, 725 (1966).

99.     The Court concludes that Defendants' debt set-off claims are not so related to Plaintiffs' Truth-in-Leasing claims that they form part of the same case or controversy.  Nor do the set-off claims derive from a common nucleus of operative fact as Plaintiffs' claims against Defendants.  See Peterson v. United Accounts, Inc., 638 F.2d 1134, 1136-37 (8th Cir. 1981)(holding that debt counterclaims are permissive in a Truth-in-Lending Act action).  The Court incorporates its reasoning and analysis from its Order of January 7, 2004, wherein the Court held that Defendants' debt counterclaims against Plaintiffs and Class members were permissive counterclaims and were not so related to Plaintiffs' claims as to form part of the same case or controversy.[33]

100.     Even if the Court were to determine that supplemental jurisdiction exists, the Court has discretionary authority to decline to exercise supplemental jurisdiction where the state-law claims "substantially predominate" over the federal claim.  28 U.S.C. § 1367(c)(2).

101.     If state-law claims predominate as a matter of (1) proof, (2) remedy, or (3) issues, dismissal is appropriate.  See Blue Dane Simmental v. American Simmental Ass'n, 952 F.Supp. 1399, 1413 (D. Neb. 1997)(citing United Mine Workers v. Gibbs, 384 U.S. 715, 726 (1966)).

102.     Adjudication of Defendants' set-offs would greatly increase the number of

---

[33]  The Court employed the following four-part test:  (1) Are the issues of fact and law raised by the claim and counterclaim largely the same?  (2) Would res judicata bar a subsequent suit on defendant's claim absent the compulsory counterclaim?  (3) Will substantially the same evidence support or refute plaintiffs' claim as well as the defendant's counterclaim?  (4) Is there any logical relationship between the claim and the counterclaim?  See Cochrane v. Iowa Beef Processors, Inc., 596 F.2d 254, 264 (8th Cir.), cert. denied, 442 U.S. 921 (1979).

factual issues the Court must consider. The Court has already found Defendants liable for violating the federal Truth-in-Leasing regulations. The Court need not engage in fact finding to determine the amount of damages to award for Defendant's violation of the regulations because the parties stipulated to the amounts of escrow funds retained for each Class member and the trial record provides sufficient fact to award damages for unpaid compensation and excessive charge-backs.

103.    On the other hand, if the Court were to determine the merits of Defendants' set-offs, it would materially increase the amount of proof required to resolve this case. Defendants would be required to submit testimony and documents supporting their claims and individual Class members would have the right to dispute Defendants' debt claims. The Court concludes that Defendants' state-law set-off claims predominate over Plaintiffs' federal claims as a matter of proof.

104.    The Court concludes that Defendants' set-off claims predominate over Plaintiffs claims and that, pursuant to 28 U.S.C. § 1367(c)(2), the Court declines to exercise supplemental jurisdiction over such claims.

105.    Finally, the Court may, "in exceptional circumstances" decline to exercise supplemental jurisdiction over a state claim "when there are compelling reasons" for doing so. 28 U.S.C. § 1367(c)(4).

106.    In this case, Plaintiffs' and the Class's claims are limited to enforcing the federal Truth-in-Leasing regulations. The Motor Carrier Act, upon which the Leasing Regulations were promulgated, has been held to be "a highly remedial statute." I.C.C. v. W.H Dudgeon, 213 F.Supp.710, 714 (S.D. Cal. 1961), cert. denied, 372 U.S. 960 (1963). "The Act being a remedial statute, it should be liberally interpreted to effect its

21

evident purpose."  Id.

107.    The I.C.C. promulgated the Leasing Regulations with the following

objectives:

> (1) to simplify existing and new regulations and to write them in understandable English; (2) to promote truth-in-leasing-a full disclosure between the carrier and the owner-operator of the elements, obligations, and benefits of leasing contracts signed by both parties; (3) to eliminate or reduce opportunities for skimming and other illegal or inequitable practices; and (4) to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry.  We believe that the final leasing rules issued in this decision will attain these objectives.

Lease and Interchange of Vehicles, 131 M.C.C. 141, 142 (1979).

108.    Courts interpreting the Leasing Regulations have also noted the purposes

of the Leasing Regulations, including the purpose of eliminating or reducing

opportunities for skimming and other illegal or inequitable practices.  See, e.g.;

Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc., 398 F. 3d 1067, 1070

(8th Cir. 2005)(noting "'the Commission's deep concern for the problems faced by the

owner-operator in making a decent living in his chosen profession,'" and observing that

"in its notice of proposed final rules, the ICC said that some of its rulemaking objectives

were to 'eliminate or reduce opportunities for skimming and other illegal or inequitable

practices; and to promote the stability and economic welfare of the independent trucker

segment of the motor carrier industry'"); Owner-Operator Indep. Drivers Ass'n, Inc.  v.

Swift Transp. Co., 367 F. 3d 1108, 1110 (9th Cir. 2004)("A primary goal of this

regulatory scheme is to prevent large carriers from taking advantage of individual

owner-operators due to their weak bargaining position").

22

109.    The Court concludes that the Motor Carrier Act is a remedial act.  The Court further concludes that the Leasing Regulations, having been promulgated by the I.C.C. pursuant to the Motor Carrier Act, are also remedial, and that the purposes of the Leasing Regulations include promoting truth-in-leasing, a full disclosure between the carrier and the owner-operator of the elements, obligations, and benefits of leasing contracts signed by both parties; as well as to eliminate or reduce opportunities for skimming and other illegal or inequitable practices; and to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry.

110.    The Court concludes that allowing Defendants to raise set-off claims for debt would be inconsistent with the purposes of the Leasing Regulations and would create a "chilling effect" over the private enforcement of the Leasing Regulations.  See Campos v. Western Dental Service, Inc., 404 F.Supp.2d 1164, 1170-71 (N.D. Calif. 2005)(declining to exercise supplemental jurisdiction over debt counterclaims in a federal Fair Debt Collection Practices Act because "exercising jurisdiction over the counterclaim would create a tremendous 'chilling effect' over the private enforcement" of the Act).  Thus, the Court concludes that there are compelling reasons, pursuant to 28 U.S.C. § 1367(c)(4), for it to decline to exercise supplemental jurisdiction over Defendants' set-off claims against Plaintiffs and Class members.

111.    Defendants also assert, based upon the decision in OOIDA v. Arctic Express, Inc., 288 F.Supp.2d 895 (S.D. Ohio 2003), that they should be able to recover "unrecouped" maintenance expenses against Plaintiffs and Class members' maintenance reserve escrow funds.

112.    Defendants' reliance upon Arctic is misplaced.  In Arctic, the lease

23

agreement between defendant and its owner-operators provided that the driver pay nine cents per mile into a maintenance fund that would cover all maintenance for the truck. See OOIDA v. Arctic Express, Inc., 159 F.Supp.2d 1067, 1070 (S.D. Ohio 2001). The Arctic lease did not limit the maintenance fund to only repairs that both exceeded $2500 and were related to the drivetrain.

113. In this case, the maintenance escrow was limited, by the terms of the lease itself, only to repairs that both exceeded $2500 and were related to the drivetrain. Defendants do not submit any evidence that any specific Class member had drivetrain repairs exceeding $2500. The Court concludes that Defendants may not deduct alleged unrecouped maintenance expenses from Plaintiffs' and Class members' maintenance reserve escrow funds.

       2.    Conclusions of Law Relating to Defendants' "Windfall" Argument

114. Defendants assert that Plaintiffs and Class members would receive a "windfall" if the Court were to require Defendants to return Plaintiffs and Class members' security deposits and maintenance reserve escrow funds. Defendants assert that, under the facts of this case, it would be unjust and inequitable for Defendants to return Plaintiffs and Class members' escrow funds when Defendants have allegedly advanced monies to, and made repairs for, the benefit of Plaintiffs and Class members.

115. In essence, Defendants are asserting that Plaintiffs and Class members would be unjustly enriched by the return of their escrow funds. The elements of unjust enrichment are: (1) a benefit conferred upon defendant by plaintiff; (2) appreciation of the fact of such benefit by defendant; (3) acceptance and retention by the defendant of that benefit under circumstances in which retention without payment would be

24

inequitable.  Ernst v. Ford Motor Co., 813 S.W.2d 910, 918 (Mo.App. W.D.1991).

116.    The Court concludes that Defendants have not satisfied the requirements for a successful unjust enrichment claim.  The Court concludes that the repayment of Plaintiffs and Class members' escrow claims would not be "inequitable" under the circumstances in this case.  The Court, in reaching this conclusion, relies upon the fact that Defendants designed and implemented a business model based upon a constant and extremely high turnover rate on the part of Ledar's drivers to force the forfeiture of drivers' escrow funds and in order for Carl and Scott Higgs to maintain their equity and title to the trucks leased to its drivers.

**I.      Findings of Fact Regarding Plaintiffs' Compensation Claim**

117.    Plaintiff Jason Buckallew's lease agreement with Ledar required Ledar to pay Buckallew at a rate of $ 0.80 per mile.[34]

118.    Plaintiff Paul David Horn's lease agreement with Ledar required Ledar to pay Horn at a rate of $ 0.80 per mile.[35]

119.    Class Member Dean Adams' lease agreement with Ledar required Ledar to pay Adams at a rate of $ 0.80 per mile.[36]

120.    After Buckallew informed Ledar that he was leaving, he did not receive compensation for approximately 3600 miles.[37]

--------

[34]  Pls. Tr. Ex. 19.

[35]  Pls. Tr. Ex. 11.

[36]  Pls. Tr. Ex. 49.

[37]  Tr. 173/16 - 175/16 (Buckallew); Pls. Tr. Exs. 26, 27.

25

121.   Horn did not receive compensation for 3371 miles he drove for Ledar after he stated that he was terminating.[38]

122.   Dean Adams has not received compensation for more than 7500 miles he drove for Ledar.[39]

**J.     Conclusions of Law Regarding Plaintiffs' Compensation Claims**

123.   The Court concludes that Ledar failed to pay Plaintiff Jason Buckallew $2880 in compensation owed to Buckallew.

124.   The Court concludes that Ledar failed to pay Plaintiff David Horn $2696.80 in compensation owed to Horn.

125.   The Court concludes that Ledar failed to pay Class member Dean Adams $6,000 in compensation owed to Adams.

126.   The Court awards damages to the above-named Plaintiffs and Class member in the amounts stated above, totaling $11,576.80.

**K.     Findings of Fact Relating to Plaintiffs' Excess Advance Claim**

127.   Ledar charged Class members an undisclosed "excess advance fees" when Class members took advances from Ledar.[40]

128.   Ledar also charged Class members a $2.10 "transaction fee" and a $5.00 "administrative fee" for advances Class members received for fuel and expenses.[41]

---

[38]  Tr. 201/4 - 202/2 (Horn); Pls. Tr. Ex. 15.

[39]  Tr. 121/18 - 126/25 (Adams); Pls. Tr. Exs. 56 - 58.

[40]  Tr. 710/4-12 (Carl Higgs).

[41]  Tr. 649/22-651/15 (Carl Higgs).

26

These "transaction" and "administrative" fees were charged in addition to the "excess advance fee."

129.    Class member Billy Eiland had various amounts deducted from his compensation for "excess advance" charges.[42]  Eiland was never told by anyone at Ledar that he would be charged an "excess advance" fee.[43]

130.    For the week ending June 22, 2000, Eiland was charged a $25 "excess advance fee" for taking an advance of $75.[44]  For the week ending July 6, 2000, he was charged $25 for taking a $75 advance.[45]  For the week ending August 3, 2000, Ledar charged Eiland a $20 excess advance fee for taking a $275 advance.[46]  For the week ending August 31, 2000, Ledar charged Eiland a $50 excess advance fee for taking a $275 advance.[47]

131.    Ledar charged many Class members "excess advance fees" of $5.00 for advances of $25.00.  The $25 advance would be repaid to Ledar out of the driver's compensation the following week.[48]

132.    Ledar charged Class members an annualized interest rate in excess of

---

[42]  Tr. 335/12-19; 342/11-13, 345/15-17 (Eiland).

[43]  Tr. 335/18-20.

[44]  Pls. Tr. Ex. 75.

[45]  Pls. Tr. Ex. 77.

[46]  Pls. Tr. Ex. 81.

[47]  Pls. Tr. Ex. 85.

[48]  Tr. 710/4-21 (Carl Higgs).

1,000% when it charged Class members $5 in interest for a loan of $25 for one week.[49]

133.   Carl Higgs admitted that the purpose of the "excess advance fee" was to "discourage people from borrowing that money anyway."[50]

134.   Carl Higgs also admitted that charging drivers over 1,000% interest on a loan was "excessive" and that he would not borrow money at such a high rate of interest.[51]

135.   Ledar charged 182 individual Class members a total of $5,845.85 in "excess advance fees."[52]


**L.     Conclusions of Law Relating to Plaintiffs' Excess Advance Claim**

136.   The Court concludes that individual Class members have suffered damages equal to the amount they were charged by Ledar for "excess advance fees."

137.   The Court hereby awards damages to Class members in the amount equal to the amount they were charged by Ledar for "excess advance fees" ($5,845.85).

**M.     Findings of Fact Regarding Damages to Plaintiffs and Individual
          Class Members**

138.   Plaintiffs have submitted, as Exhibit C to their Motion for Summary Judgment on Damages, a Summary of Damages by Class Member.  (Doc. # 412).

---

[49]  Tr. 711/4-8.

[50]  Tr. 711/7-8 (Carl Higgs).

[51]  Tr. 711/18-21 (Carl Higgs).

[52]  Pls. Uncontroverted Facts in Support of Motion for Summary Judgment on Damages at  1339-1521.  The identity of each Class member and the amount deducted for "excess advance fees" are contained in these uncontroverted facts, Doc. # 412.

28

139. The Summary of Damages states (1) the identity of each individual Plaintiff and Class member; (2) the amount of damages for each individual by category (i.e., maintenance reserves, interest, excess advance fee); and the total amount of damages for each individual.

140. The Court finds that the Summary of Damages accurately reflects the amount of damages suffered by each Plaintiff and Class member for each claim and the total amount of damages for each individual Plaintiff and Class member.

141. The Court finds that the total amount of damages incurred by Plaintiffs and Class members equals $996,601.53. (Summary of Damages).

142. The Court finds that Defendants are jointly and severally liable to Plaintiffs and Class members in the amount of $996,601.53.


**N.  Conclusions of Law Regarding Damages to Plaintiffs and Individual Class Members**

143. The Court concludes that damages shall be distributed to Plaintiffs and individual Class members per the amount of damages suffered by each Plaintiff and Class member as contained in the Summary of Damages worksheet.

144. The Court hereby awards damages to Plaintiffs and Class members and against Defendants Ledar Transport, Inc., Hawthorne Leasing, Inc., Carl E. Higgs, Alice Norma Higgs and Scott L. Higgs, jointly and severally, in the amount of $996,601.53.

**CONCLUSION**

Accordingly, for the reasons stated above, the Court hereby **GRANTS** plaintiff's

29

Motion for Summary Judgment (Doc. # 411) and enters judgment in favor of plaintiffs and class members against defendants, jointly and severally, in the amount of $996,601.53.

Date: __3/31/08_____
Kansas City, Missouri

**S/ FERNANDO J. GAITAN, JR.**
Fernando J. Gaitan, Jr.
Chief United States District Judge